IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DH2, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 04 C 0487 |
| | ) | |
| THEODOSSIOS ATHANASSIADES, | ) | |
| JETTIE M. EDWARDS, DAVID WAYNE FOX, | ) | |
| WILLIAM MICHAEL KEARNS, JR., | ) | |
| CHRISTOPHER P.A. KOMISARJEVSKY, | ) | |
| PETER DANA NORIS, HARVEY ROSENTHAL, | ) | |
| GARY S. SCHPERO, EQUITABLE LIFE | ) | |
| ASSURANCE SOCIETY OF THE UNITED STATES, | ) | |
| AND EQUITABLE ADVISORS TRUST, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiff DH2, Inc. has filed a Second Amended Complaint ("SAC") alleging securities

fraud in connection with Defendants' mutual fund pricing. The case pertains to the pricing of

foreign securities held in mutual funds. Defendants have moved to dismiss the SAC. As

discussed in detail below, Defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

### I.     The Parties

Plaintiff DH2 is a corporation organized under the laws of Illinois, with its principal

place of business in Northbrook, Illinois. (R. 62-1, SAC, ¶ 18.) DH2 invests in mutual funds,

variable annuities, and other investment instruments in accordance with a proprietary, highly

---

[1] The Court assumes the facts alleged in the SAC are true for purposes of this motion.

confidential trading strategy.  (*Id.* ¶ 18.)  DH2 manages the assets of two of its affiliates –

Emerald Investment, LP ("Emerald") and Elkhorn LLC ("Elkhorn").  (*Id.*)

Defendant Equitable Life Assurance Society of the United States ("Equitable") is owned

and controlled by the AXA Group, a company headquartered in France.  (*Id.* ¶ 19.)  It sells

variable annuity contracts to the investing public.  (*Id.* ¶ 20.)  The variable annuity contracts

enable investors to invest in separate accounts managed by an Equitable captive entity –

Equitable Advisors Trust ("EQAT").  (*Id.*)  These separate accounts are a form of mutual fund.

(*Id.*)  Accumulator and Equi-Vest are two variable annuity contracts offered by Equitable.  (*Id.* ¶

34.)

Defendants Theodossios Athanassiades, Jettie M. Edwards, David Wayne Fox, William

Michael Kearns, Jr., Christopher P.A. Komisarjevsky, Peter Dana Noris, Harvey Rosenthal, and

Gary S. Schpero were Trustees of EQAT.  (*Id.* ¶¶ 22-29.)  (Collectively, these Defendants are

referred to as the "Trustees" or the "Individual Defendants").  Plaintiff alleges that Equitable and

each of these Trustees exercised control over EQAT's pricing within the meaning of the

Investment Company Act, 15 U.S.C. § 80a-2(a)(9).  (*Id.* ¶¶ 30-31.)  DH2 further alleges that

each Trustee owed it "the highest duty of good faith and loyalty."  (*Id.* ¶ 55.)  As such, DH2

contends that the Trustees should have acted in DH2's best interests, and not placed "the

interests of Equitable or other classes of investors ahead of DH2's interests."  (*Id.* ¶ 55.)

## II.     DH2's Trading Strategy

"DH2 is a 'market timer' – a firm that exploits mutual fund mispricing that occurs when

market prices for the fund's underlying securities have become stale due to events after the

relevant trading market has closed."  *DH2, Inc. v. U.S. S.E.C.*, 422 F.3d 591, 592 (7th Cir. 2005).

It "trades in mutual funds and makes money by taking advantage of short-term price/value discrepancies that occur when the current value of a fund's portfolio securities has changed and that change is not yet reflected in the fund's share price." *Id.* DH2's core corporate asset consists of its proprietary and confidential trading strategy. (R. 62-1, SAC, ¶ 33.) DH2's trading strategy is a closely held trade secret, and DH2 expends significant efforts to minimize the risk of disclosing this strategy. (*Id.*) DH2's continued profitability depends on its ability to employ this confidential strategy. (*Id.*)

III.    **DH2's Investments**

EQAT is a form of mutual fund that exists solely to hold and invest assets within variable insurance contracts for the benefit of the owner of the variable insurance contract. (*Id.* ¶ 35.) EQAT contains multiple different portfolios, each of which acts as a separate investment fund that issues interests or shares. (*Id.*) "Subaccounts," a form of mutual fund, are the underlying investment options of the variable annuities. (*Id.* ¶ 36.) An investor in a variable annuity contract initially makes an investment or contribution to Equitable, then the investor may allocate that contribution between and among the designated investment funds, or subaccounts, of EQAT. (*Id.*) The investor may make subsequent contributions to Equitable in the same manner. (*Id.*)

The Accumulator is a variable annuity contract offered to the public by Equitable. (*Id.* ¶¶ 34, 58.) Equitable marketed this product to DH2 by prospectuses and related documents. (*Id.* ¶ 58.) According to the prospectus:

> Our business day is any day the New York Stock Exchange is open for trading. Each business day ends at the time trading on the exchange closes or is suspended for the day. We calculate unit value for our variable investment options as of the end of each business day. This is usually 4:00 p.m. Eastern Time... If your

contribution, transfer or any other transaction request, containing all the required information, reaches us on a non-business day or after 4:00 p.m. on a business day, we will use the next business day.  (*Id.* ¶ 61.)

On September 15, 1999, DH2 made an initial contribution to Equitable of $900,000.  (*Id.* ¶ 63.)  Equitable issued DH2 a Certificate, explaining that the investment product is a "combination fixed and variable deferred annuity," and that Equitable "will provide the benefits and other rights pursuant to the terms of this Certificate."  (*Id.*)  DH2 made the following additional capital contributions to its account with Equitable: $561,000 (September 19, 1999); $130,000 (December 27, 1999); $1,000,000 (January 4, 2000); $485,000 (July 27, 2000); and $490,000 (July 31, 2000).  (*Id.* ¶ 118.)  Equitable's total contributions and investment gains amount to approximately $7.5 million.  (*Id.* ¶ 63.)  DH2's contract permitted it to transfer its contributions among EQAT investment funds "at any time" without any penalty or charge.  (*Id.* ¶ 66.)  In 1999, Emerald – DH2's affiliate – invested in both the Accumulator and Equi-Vest products based on similar information.  (*Id.* ¶¶ 69-72.)

## IV.    Pricing of Funds

As the Seventh Circuit recently summarized:

The Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 et seq. ..., requires mutual fund shares to be sold and redeemed at a price that: will bear such relation to the current net asset value of such security computed as of such time as the rules may prescribe ... *for the purpose of eliminating or reducing ... any dilution of the value of other outstanding securities* of such company or any other result of such purchase, redemption or sale which is unfair to holders of such other outstanding securities.  15 U.S.C. § 80a-22(a) (emphasis added).  For purposes of computing NAV, the ICA defines "value" as follows: "(i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) with respect to other securities and assets, fair value as determined in good faith by the board of directors [.]" 15 U.S.C. § 80a-2(a)(41)(B) (emphasis added).

*DH2, Inc*,  422 F3d at 591.

Plaintiffs contend that EQAT is required to determine the purchase and redemption price of each of its funds by determining the net asset value ("NAV") per share of each such fund. (*Id.* ¶ 42.) According to the SAC, the Investment Company Act dictates the price at which each of the EQAT portfolio fund share purchases and redemptions is conducted, and the process for establishing that price. Plaintiff alleges that Section 2(a)(41) of the Investment Company Act mandates the use of actual market quotations of each individual security within the fund to calculate the NAV of the fund and the purchase and redemption of prices of fund shares. (*Id.* ¶ 40.) In essence, DH2 alleges that Defendants should have used market quotations, rather than fair value pricing to calculate the NAVs and establish the share price of the funds at issue.

Plaintiff further alleges that Equitable should have used actual market quotations to compute the NAVs "even if those quotations were as old as 72 hours." (*Id.* ¶ 45.) Defendants are not permitted to use fair values, DH2 asserts, to value underlying assets unless actual market quotations are not readily available. (*Id.*) When Defendants are permitted to use fair values, they must estimate them individually, portfolio security-by-security, by the funds' directors, "who are required to calculate what a buyer and seller would pay now ... for each security." (*Id.*) The Trustees must determine the fair value when employed in good faith. (*Id.* ¶ 44.) Plaintiff alleges that Defendants do not have discretion to select a different pricing method. (*Id. ¶ 40*)

## V.    The Emerald Action

In 2000, Emerald sued Equitable in the Northern District of Illinois. *American National Bank and Trust Co., et al. v. AXA Client Solutions, et al.,* No. 00 C 6786 (the "Emerald Action"). (*Id.* ¶ 77.) Emerald premised the Emerald Action on Equitable's alleged restrictions and interference with Emerald's market-timing trading strategy. (*Id.* ¶¶ 73-77.) It asserted claims

for breach of contract and for promissory estoppel.  (*Id.* ¶ 77.)

During the course of the Emerald Action, Plaintiff alleges that Emerald improperly disclosed to Equitable DH2's confidential trading strategy.  Although a protective order governed the disclosure of such information, Plaintiff alleges that Equitable violated the protective order numerous times and used the confidential discovery to interfere with Emerald's and DH2's trading.  (*Id.* ¶ 99.)  On May 28, 2002, the court in the Emerald Action sanctioned Equitable for violating the protective order.[2]  (*Id.* ¶ 106.)

## VI.     Defendants Adopt Fair Value Pricing

DH2 alleges that in September 2001, the Trustees approved a "fair value pricing" scheme whereby Defendants 1) planned to adjust the NAV routinely at 4:00 pm Eastern Time in violation of statutory requirements, and 2) failed to conduct the fair valuation as required by law because not all of the Trustee Defendants personally conducted or closely supervised the valuations with care or in good faith.  (*Id.* ¶ 92.)  DH2 further alleges that Defendants did not design their methodology to estimate a 4:00 p.m. Eastern time value of the NAV, but rather to "generally target the next day's close because that's where the best data is available."  (*Id.*) Furthermore, DH2 contends that Defendants failed to disclose this fair value pricing scheme to DH2 or the investing public.  (*Id.* ¶¶ 93-95.)

---

[2] During the course of the Emerald Action, the magistrate judge struck Equitable's privilege log as a discovery sanction and ordered Equitable to produce all of the documents listed on that log to Emerald.  In response, Equitable provided the claimed privilege documents to Emerald, who in turn provided them to DH2.  Equitable appealed the magistrate judge's ruling regarding the privilege log, and the Seventh Circuit reversed and remanded the case.  *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.,*  406 F.3d 867, 880 (7th Cir. 2005).  The Seventh Circuit ordered the return of all of the privilege log documents. *American Nat'l Bank & Trust Co.*, 406 F.3d at 869.

Prior to implementing the fair value pricing methodology, Defendants issued a "Statement of Additional Information" regarding fair value pricing and foreign securities. That statement provided:

> If the Trust determines that a material change in the value of a foreign security has occurred after the close of trading in the foreign market(s) in which a Portfolio invests but before the close of regular trading on the NYSE, the Trust may use fair value methods to reflect those changes. In addition, the Trust may use fair value methods to value securities in other situations, for example, when a particular foreign market is closed but the Trust is open. This policy is intended to assure that a Portfolio's net asset value fairly reflects securities values as of the time of pricing.

(R. 75-1, Ex. F at 69.)

In May 2002, DH2 alleges that Defendants implemented an undisclosed "new system" to price the NAV. (*Id.* ¶ 113.) Plaintiff alleges that the new system violated the court order in the Emerald Action because Defendants wrongly utilized DH2's proprietary and confidential trading technique in developing the pricing system. (*Id.* ¶ 116.) The SAC asserts that Defendants adopted this system "to more closely track, counter-act, and undercut the trading strategy employed by DH2." (*Id.*) As a result, the profitability of DH2's trading declined, and DH2 ultimately reduced and then halted its trading in Equitable funds. (*Id.* ¶¶ 114-115, 122.)

## VII. The Securities and Exchange Commission

In an effort to curb market timing, the SEC "changed its interpretation of the rules regarding how mutual funds calculate their daily prices." *DH2, Inc. v. Securities & Exchange Comm'n*, 422 F.3d 591, 592 (7th Cir. 2005). Commencing in 2001, the SEC issued various releases directing mutual funds to estimate the current fair value price of a security when the actual market price at which that security closed has become unreliable.

### A.     The Scheidt Letter of April 30, 2001

On April 30, 2001, Douglas J. Scheidt, Associate Director and Chief Counsel for the

SEC's Division of Investment Management, issued a letter to the mutual fund industry regarding

fair value pricing.  (*Id.* ¶ 84.)  In that letter, Scheidt stated:

> The 1940 Act requires funds to calculate their net asset values (NAVs) by using the
> market value of their portfolio securities when market quotations for those securities are
> "readily available."  When market quotations for a portfolio security are not readily
> available, a fund must calculate its NAV by using the fair value of that security, as
> determined in good faith by the fund's board....  Typically, funds calculate their NAVs
> once each day or at or near the close of the major U.S. securities exchanges and markets
> (usually 4:00 p.m., Eastern Time ("ET")).

> Funds generally calculate their NAVs by using the closing price of portfolio securities on
> the exchange or market (whether foreign or domestic) on which the securities principally
> trade.  Many foreign markets, however, operate at times that do not coincide with those
> of the major U.S. markets ....  As a result, the closing prices of securities that principally
> trade on foreign exchanges or markets ("foreign securities") may be as much as 12-15
> hours old by the time of the funds' NAV calculation, and may not reflect the current
> market values of those securities at that time.  In particular, the closing prices of foreign
> securities may not reflect their market values at a funds' NAV calculation if an event that
> will affect the value of those securities ("significant event") has occurred since the
> closing prices were established on the foreign exchange or market, but before the fund's
> NAV calculation.

(R. 75-1, Ex. G.)

Scheidt acknowledged that the value of a shareholder's interest may be diluted if the fund

calculates its NAV based on established prices before a significant event has occurred.  "In such

situations, short-term investors may attempt to exploit the discrepancies between market prices

that are no longer current, and the values of a fund's portfolio securities."  *Id.*  Scheidt added that

"[f]air value pricing can protect long-term fund investors from short-term investors who seek to

take advantage of funds as a result of significant events occurring after a foreign exchange or

market closes, but before the funds' NAV calculation."  *Id.*  Scheidt further commented

regarding fair value pricing for foreign securities:

> Additionally, with regard to a foreign security, a fund must evaluate whether a significant event (i.e., an event that will affect the value of a portfolio security) has occurred after the foreign exchange or market has closed, but before the fund's NAV calculation. If the fund determines that a significant event has occurred since the closing of the foreign exchange or market, but before the fund's NAV calculation, then the closing price for that security would not be considered a "readily available" market quotation, and the fund must value the security pursuant to a fair value pricing methodology.

*Id.*

Scheidt stressed that the board of a fund must act in "good faith" when determining the fair value when market quotations are not readily available. "In our view, a board acts in good faith when its fair value determination is the result of a sincere and honest assessment of the amount that the fund might reasonable expect to receive for a security upon its current sale, based upon all of the appropriate factors that are available to the fund." *Id.* He cautioned that good faith is a "flexible concept."

### B.     The SEC's Final Rule Regarding Compliance Programs of Investment Companies and Investment Advisers

On December 24, 2003, the SEC adopted a new rule for Compliance Programs of Investment Companies and Investment Advisers , 68 FR 74714 ("Compliance Rule Release"). The SEC noted that mispricing of funds may occur when portfolio securities are traded on a foreign market and the foreign market closes before the fund prices its shares. In such circumstances, the foreign market closing price "will not reflect the correct current value of those securities when the fund prices its shares." *Id.* at 14. The SEC clearly stated its position that funds that failed to value their portfolio securities under these circumstances were violating the Investment Company Act. Accordingly, the SEC directed investment companies "to adopt policies and procedures that require the fund to monitor for circumstances that may necessitate

the use of fair value prices; establish criteria for determining when market quotations are no longer reliable for a particular portfolio security; provide a methodology or methodologies by which the fund determines the current fair value of the portfolio security; and regularly review the appropriateness and accuracy of the method used in value securities, and make any necessary adjustments." *Id.*

C. **The SEC's April 23, 2004 Disclosure Regarding Marketing Timing and Selective Disclosure of Portfolio Holdings**

On April 3, 2004, the SEC issued its final rule regarding Disclosure Regarding Marketing Timing and Selective Disclosure of Portfolio Holdings, 69 FR 22300 ("Market Timing Rule"). It noted that the "Commission is extremely concerned by the abuses that have surfaced in the mutual fund industry ...." In order to address these concerns, the SEC, among other actions, issued the Market Timing Rule. In that Rule, the SEC required that "funds are required to use fair value prices any time that market quotations for their portfolio securities are not readily available (including when they are not reliable)." *Id.* at 22304-05. The Market Timing Rule requires mutual funds to explain briefly in their prospectuses "both the circumstances under which they will use fair value pricing and the effects of using fair value pricing." *Id.* at 22304.

## PROCEDURAL BACKGROUND

I. **The SEC Action**

In January 2004, DH2 filed a separate action in the Northern District of Illinois against the Securities and Exchange Commission ("SEC"). *DH2 v. SEC*, 04 C 789 (N.D. Ill.) (the "SEC Action"). In the SEC Action, DH2 challenged the SEC's Compliance Rule Release directing investment companies to calculate the value of mutual funds based on fair value pricing. DH2 argued that fair value pricing violated the Investment Company Act's requirements. The district

court judge dismissed the SEC Action for lack of jurisdiction and transferred the case to the Seventh Circuit.

The Seventh Circuit held that DH2 does not have standing to challenge the SEC's rules "requiring mutual fund companies to estimate the current 'fair value' of a security when the market price at which that security closed has become unreliable." *DH2, Inc. v. S.E.C.*, 422 F.3d 591 (7th Cir. 2005). The Seventh Circuit found that DH2 had not established the requisite elements for standing. It further noted:

> With or without the challenged statements in the SEC releases, mutual funds have the discretion to use fair value pricing in lieu of market quotations when circumstances warrant the conclusion that market quotations are no longer current. *See* 15 U.S.C. §§ 80a-22, 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a)(1), (c). Thus, to a significant degree, the injury DH2 complains of hinges on the decisions of independent actors whose discretion – though subject to securities laws and regulation by the SEC – is nonetheless quite broad. *See Lujan[v. Defenders of Wildlife*, 504 U.S. [555] at 560, 112 S.Ct. 2130 ("there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court") (quoting *Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).

*Id.* at 597.

## II.    The Current Action

DH2 filed this case on January 21, 2004. On March 10, 2005, the Court granted Defendants' motion to dismiss the First Amended Complaint ("FAC"), dismissing Count One with prejudice and the remaining counts without prejudice. *DH2, Inc. v. Athanassiades*, 359 F.Supp.2d 708 (N.D. Ill. 2005). Specifically, the Court dismissed Plaintiff's claim of price manipulation under Section 17(j) of the Investment Company Act, 15 U.S.C. § 80a-17(j), and Rule 17j-1, with prejudice on the ground that no private cause of action exists to enforce this section of the ICA. The Court dismissed Plaintiff's federal securities fraud claims without

prejudice for failure to meet the strict pleading mandates of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, et seq.

On April 25, 2005, DH2 filed its SAC. The SAC contains twelve counts. Counts One (price manipulation) and Three (fraudulent misrepresentations) are premised on violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 thereunder. Counts Two and Four allege violations of Sections 12(F), (G), (H) and (I) of the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/12(F). Count Five asserts a breach of fiduciary duty claim under Section 36(a) of the Investment Company Act. Count Six alleges a breach of fiduciary duty under common law. Counts Seven and Eight are both control person liability claims – Count Seven alleges a violation of Section 20(a) of the Exchange Act and Count Eight alleges a violation of Section 48 of the Investment Company Act of 1940. Count Nine alleges that Defendants misappropriated trade secrets under the Illinois Trade Secret Act. Count Ten asserts that Defendants violated Section 2 of the Illinois Consumer Fraud and Deceptive Practices Act. Count Eleven alleges breach of contract against Defendants, and Count Twelve alleges fraud. Defendants move to dismiss the SAC in its entirety.

**ANALYSIS**

**I.     Legal Standards**

A Rule 12(b)(6) motion "test[s] the sufficiency of a complaint." *Johnson v. Rivera,* 272 F.3d 519, 520-21 (7th Cir. 2001). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court views "the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003). "A complaint should

not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004) (quotations and citations omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*, quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

In deciding a Rule 12(b)(6) motion to dismiss, the Court can consider any documents incorporated or referenced in the complaint. *See Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 731 (7th Cir. 2005) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim."); *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 640 (7th Cir. 2005) (same). Additionally, the Court may take judicial notice and consider any documents "contained in the public record, and reports of administrative bodies" on a motion to dismiss. *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

## II. Section 36(a) of the Investment Company Act

Plaintiff premises Count Five on a violation of Section 36(a) of the Investment Company Act of 1940 ("ICA"). This Court recently held that Section 36(a) does not provide for a private right of action." *Dull v. Arch*, No. 05 C 140, 2005 WL 1799270, *2 (N.D. Ill. July 27, 2005). *See also Hamilton v. Allen*, 2005 WL 2660356, at *6 (E.D. Pa. Oct. 14, 2005) (no private right of action under Section 36(a)); *In re Mutual Funds Inv. Litig.*, 384 F.Supp.2d 845, 870 (D.Md. 2005) (same); *Stegall v. Ladner,* 394 F.Supp.2d 358, 369 (D. Mass. 2005) (same). Plaintiff has failed to provide any argument or bases for the Court to reconsider its holding in *Dull*. For the reasons set forth in the Court's opinion in *Dull*, Count Five is dismissed with prejudice. *See also*

*Jacobs v. Bremner*, 378 F.Supp.2d 861, 864-65 (N.D. Ill. 2005)  (No private cause of action under Section 36(a)).

### III.      Section 10(b) – Manipulation

Count I alleges a price manipulation claim under Section 10(b) of the Exchange Act and Rule 10b-5.  "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). DH2 must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue."  *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 492 (S.D.N.Y. 2005).  As the Court previously held, DH2 must identify each alleged manipulative act performed and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *DH2, Inc. v. Athanassiades*, 359 F.Supp.2d 708, 716 (N.D. Ill. 2005), quoting 15 U.S.C. § 78u-4(b)(2).

DH2 essentially alleges three different market manipulation schemes.  First, Plaintiff alleges that Defendants adopted and implemented an undisclosed method of setting mutual fund prices "that they call 'fair value pricing.'" (R. 62-1, SAC, ¶ 3.)  Plaintiff contends that fair value pricing per se violates the Investment Company Act of 1940 because it deviates from the requirement of using actual market quotations.  Second, DH2 alleges that even if fair value pricing is appropriate, Defendants manipulated the mutual fund prices by adopting a fair value pricing methodology that deviated from their fiduciary duties.  (*Id.* ¶ 92.)  Third, DH2 alleges that Defendants "unlawfully obtained DH2's secret trading techniques and used those secret

techniques in setting 'fair value' prices." DH2 further alleges that Defendants' unlawful use of DH2's trade secrets further distorted the mutual fund share prices to "values that plainly overshot the hypothetical value as of 4:00 p.m. Eastern time." (*Id*. ¶ 4.)

## A.    Pricing Methodology

Defendants seek dismissal of DH2's market manipulation claims because they contend that DH2 has not alleged that the pricing methodologies for the Accumulator funds were improper, thus DH2's market manipulation claims necessarily fail as a matter of law. Defendants contend that because the fair value pricing methodology is lawful and permissible under the ICA, use of such a methodology cannot form the basis of a market manipulation claim.

To the extent that Plaintiff rests its price manipulation claim on Defendants adoption of a fair value price methodology in response to the SEC's direction, Plaintiff has not and cannot state a claim for price manipulation. The Seventh Circuit recently noted that "DH2 does not have a legally protected interest in the perpetuation of a fund valuation formula that preserves its ability to make money in market-timing arbitrage." *DH2*, 422 F.3d at 597. It further held that "[w]ith or without the challenged statements in the SEC releases, mutual funds have the discretion to use fair value pricing in lieu of market quotations when circumstances warrant the conclusion that market quotations are no longer current.... Thus, to a significant degree, the injury DH2 complains of hinges on the decisions of independent actors whose discretion – though subject to securities laws and regulation by the SEC – is nonetheless quite broad." *Id.* Thus, the mere implementation of fair value pricing is lawful and not actionable.

Plaintiff, however, challenges more than just the adoption of a per se fair value pricing

methodology in response to the SEC's direction. DH2 also alleges that even if fair value pricing was acceptable, Defendants fair value pricing methodology resulted in inaccurate pricing. DH2 alleges that commencing in 2001 Defendants did not properly price the Accumulator funds using fair value pricing. Instead, Defendants designed the Accumulator's fair value pricing methodology based on artificial prices in order to injure Defendants. Plaintiff alleges that the Individual Defendants deviated from their duties in creating this artificial fair value price. With regard to this pre-May 2002 scheme, however, Plaintiff only alleges that "DH2's purchases and sales took place at prices that were less favorable to DH2 **than the prices that would have flowed from the use of actual market quotations** that defendants should have used in pricing the Accumulator NAV." (R. 62-1, SAC, ¶ 121) (emphasis added.) Plaintiff does not make any allegations regarding how Defendants prices compared to an appropriately applied fair value pricing methodology. They also do not identify any purchases or sales they made based on this flawed methodology prior to May 2002. Because the SEC has directed funds to use fair value pricing and not actual market quotations when "market quotations for a portfolio security are not readily available (including when market quotations are unreliable)" and because the Seventh Circuit has stated that this practice is lawful, Plaintiff has failed to allege a claim for manipulation based on these allegations and the Court dismisses this claim without prejudice.

*Kircher v. Putnam Funds Trust,* 403 F.3d 478 (7th Cir. 2005), does not provide otherwise. DH2 argues that the Seventh Circuit in *Kircher* held that fair value pricing is not permitted under the ICA when it stated "[w]hen the funds hold assets that trade in competitive markets, they must value the assets at their market price." *Id.* at 480. As the Seventh Circuit's recent holding in *DH2 v. SEC* makes clear, Plaintiff's reading of the *Kircher* opinion is too broad.

Plaintiff further alleges that, commencing in May 2002, Defendants implemented a new pricing methodology for the Accumulator fund by misappropriating DH2's proprietary trading strategy which Defendants obtained by violating the protective order in the Emerald Action. Plaintiff alleges that Defendants stole its trade secrets and "use[d] those trade secrets to manipulate the method by which NAVs are calculated." (R. 62-1, SAC, ¶ 122.) Plaintiff asserts that Defendants used Plaintiff's trading formula to set prices "away from the market in order to eliminate DH2's ability to earn profits." (*Id.* ¶ 116.) To the extent Plaintiff relies on this theory, its claim survives Defendants' challenge.

Defendants argue that DH2 has failed to allege with the required particularity that it traded shares in the Accumulator fund that were materially inaccurate based on the manipulated methodology. Regarding Plaintiff's manipulation claim based on its allegedly stolen trade secrets, DH2 has identified specific examples where it purchased or sold fund shares with manipulated prices. (*Id.*, ¶¶ 131-135.) Defendants' attempts to explain the discrepancies in the price of these shares amount to factual arguments that are inappropriate for the Court to consider at this stage.

## B. Scienter

Scienter is an essential element of Plaintiff's Section 10(b) claims. Scienter is either "the intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or the "reckless disregard of the truth" of the material asserted. *Securities & Exchange Comm'n. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). "Reckless conduct is, at least, conduct which is highly unreasonable and which represents an extreme departure from standards of ordinary care ... to the extent that the danger was either

known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1255 (N.D. Ill. 1997) (quotations omitted).

Under the PSLRA, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2) (2000). As this Court has previously held, Plaintiff may use "motive and opportunity" or "circumstantial evidence" to establish scienter under the PSLRA, as long as the allegations support a strong inference that the defendants acted recklessly or knowingly when they made the alleged misrepresentations. *DH2*, 359 F. Supp.2d at 717; *766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.*, 249 F.Supp.2d 974, 987 (N.D. Ill. 2003).

As an initial matter, Defendants wrongly argue that the Court previously found Plaintiff's motive allegations in the FAC insufficient to satisfy the PSLRA's scienter requirements. Instead, the Court dismissed Plaintiff's Section 10(b) claims in the FAC, in part, because Plaintiff used group pleading and failed to particularize its scienter allegations regarding each Defendant. *DH2*, 359 F.Supp.2d at 717 ("Group pleading allegations are insufficient under the PSLRA to establish scienter on the part of each individual Defendant").

Defendants also argue that Plaintiff has failed to meet the PSLRA's pleading requirements for scienter in the SAC. They contend that DH2 has failed to allege any facts that would give rise to a strong inference that the Trustees acted with conscious misbehavior or recklessness.

With regard to the adoption of a fair value pricing methodology, the Court agrees. Given the SEC's guidelines and directives regarding fair value pricing, even drawing all inferences in DH2's favor, the SAC does not give rise to a strong inference of scienter on this claim. The

SEC specifically recommended fair value pricing.

Regarding DH2's claim that Defendants implemented their pricing methodology by misappropriating DH2's proprietary trading strategy, rather than following the SEC's guidelines, DH2 has sufficiently alleged scienter under the PSLRA as to Defendants Noris, Equitable and EQAT. Regarding Defendant Noris, DH2 has alleged that he knew or should have known of the restrictions in the protective order in the Emerald Action. Despite these restrictions, Defendant Noris reviewed DH2's proprietary and confidential trading strategy produced pursuant to the protective order, and improperly forwarded such information to Kozlowski, an officer responsible for developing Defendant Equitable's fair value pricing methodology, for a business purpose and not for purposes of the Emerald Action. Plaintiff alleges that Noris sent Kozlowski DH2's confidential trading strategy so Kozlowski could manipulate the NAVs of the funds in which DH2 traded and decrease DH2's profits. Plaintiff further alleges that the motive behind this manipulation was to reduce Defendants' potential billion dollar liability in the Emerald Action, and to undermine DH2's trading profitability. These allegations satisfy the PSLRA's requirements. Because knowledge obtained by corporate employees acting within the scope of their employment can be imputed to the corporation, Plaintiff has also sufficiently alleged scienter on behalf of Equitable and EQAT. *See United States v. One Parcel of Land*, 965 F.2d 311, 315 (7th Cir. 1992).

The scienter allegations regarding Defendants Athanassiades, Edwards, Kearns, Komisarjevsky, Rosenthal, and Schpero, however, fall short of Plaintiff's pleading obligations. Plaintiff's motive, opportunity and individualized duty allegations do not sufficiently allege scienter regarding these Individual Defendants. As to each of these Individual Defendants,

Plaintiff alleges that he or she had a duty to personally conduct and closely supervise the pricing valuation for the funds at issue. (SAC, ¶¶ 168, 170, 172, 174, 176, 178.) Plaintiff then alleges that if each Individual Defendant had "fulfilled his non-delegable statutory duty, in his role as an EQAT Trustee, he approved, acquiesced, and ratified Equitable's self-dealing by manipulating the NAVs of the Accumulator funds using DH2's stolen information for the purpose of reducing Equitable's potential damages in the Emerald action. If he failed to fulfill his non-delegable statutory duty, he was reckless through lack of inquiry and supervision." (*Id.* ¶¶ 169, 171, 173, 175, 177, 179.) These are the only particularized allegations regarding Defendants Athanassiades, Edwards, Kearns, Komisarjevsky, Rosenthal, and Schpero. These allegations simply do not give rise to a strong inference that these Defendants acted with the requisite scienter in Defendants' alleged manipulation of fair value pricing through the use of Plaintiff's trade secrets. DH2 does not even allege that these Defendants knew or had reason to know that the information used to calculate the NAVs commencing in May 2002 allegedly was derived from Plaintiff's trade secrets. DH2 does not make any allegations that these Defendants knew of the protective order in the Emerald Action or its restrictions, much less that Equitable had violated it. DH2 fails to plead scienter on the part of Defendants Athanassiades, Edwards, Kearns, Komisarjevsky, Rosenthal, and Schpero, and the Court dismisses the remaining manipulation claim against them without prejudice.

IV.     **Section 10(b) – Misrepresentations**

The "basic elements" of a Section 10(b) misrepresentation claim include: (1) a material misrepresentation or omission, (2) "scienter, i.e., a wrongful state of mind," (3) a connection with the purchase or sale of a security, (4) "reliance, often referred to in cases involving public

securities markets (fraud-on-the-market cases) as 'transaction causation,'" (5) economic loss, and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, -- U.S. --, 125 S.Ct. 1627, 1631, 161 L.E.2d 577 (2005).

### A.    Misrepresentation

Defendants argue that DH2 has failed to identify any false or materially misleading statement allegedly made by Defendants.  Defendants argue that they made specific disclosures that would lead a reasonable investor to know that the Trust might use fair value pricing if it determined that market quotations for foreign securities were unreliable.

EQAT issued a Statement of Additional Information, dated May 1, 2001, and sent the Statement to its investors.  It specifically represented that it would determine values "according to accepted accounting practices and all laws and regulations that apply."  In that Statement, EQAT directly addressed the pricing of foreign securities trading in a foreign market:

> If the Trust determines that a material change in the value of a foreign security has occurred after the close of trading in the foreign market(s) in which a Portfolio invests but before the close of regular trading on the NYSE, the Trust may use fair value methods to reflect those changes.  In addition, the Trust may use fair value methods to value securities in other situations, for example, when a particular foreign market is closed but the Trust is open.  This policy is intended to assure that a Portfolio's net asset value fairly reflects securities values as of the time of pricing.  (R.75-1, Ex. F at 69.)

To the extent Plaintiff's misrepresentation claim rests on the mere implementation of a fair value pricing methodology as endorsed by the SEC, it fails for the same reasons discussed above.  Consistent with the Court's rulings regarding DH2's market manipulation claim, however, DH2 has alleged a Section 10(b) misrepresentation claim based on its allegations that Defendants did not disclose that their fair market pricing methodology was designed to counteract DH2's trading strategy and was based on DH2's trade secrets.  Such allegations are

inconsistent with Defendants' representations.

**B.    Scienter**

For the reasons discussed above, Plaintiff has sufficiently alleged scienter regarding its Section 10(b) claim against Defendants Noris, Equitable and EQAT, based on Defendants' actions commencing in May 2002.  It has failed, however, to allege scienter on the part of Defendants Athanassiades, Edwards, Kearns, Komisarjevsky, Rosenthal, and Schpero.

**C.    Loss Causation**

Loss causation –"a causal connection between the material misrepresentation and the loss"– is an essential element of a Section 10(b) securities fraud claim.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. ----, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).  In *Dura Pharms*., the Supreme Court found the plaintiffs' mere allegation that it "'paid artificially inflated prices for Dura's securities' and suffered damage[s]" was insufficient to plead loss causation. The Supreme Court held that "the 'artificially inflated purchase price' is not itself a relevant economic loss.  And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's 'spray device.'" *Id.* at 1634.  The Supreme Court expressly noted that Federal Rule of Civil Procedure 8(a)(2) governs a plaintiff's allegations of loss causation, not Rule 9(b), and that pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Id*. at 1634.

Defendants argue that DH2 has failed to plead loss causation, essentially because it has not alleged price manipulation.  Defendants go on to admit, however, that if Plaintiff "can show that the prices at which it purchased or sold shares of the Trust were artifically inflated or

22

deflated, it may be able to prove that it suffered losses as a result of the alleged price manipulation." (R. 74-1, Defs. Mem. in Support Mot. to Dismiss, at 40.) As discussed above, Plaintiff has sufficiently alleged a claim for manipulation based on Defendants alleged use of DH2's stolen trade secrets. Accordingly, Defendants' loss causation challenge fails.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

Date: December 14, 2005

ENTERED

AMY J. ST. EVE
United States District Court Judge